**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL DAUGHERTY, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WISE GROUP PLC, KRISTO KÄÄRMANN, and EMMANUEL THOMASSIN,<br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Daniel Daugherty ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Wise Group plc ("Wise", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary

1

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Wise securities between May 11, 2026 and July 23, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted. Further, British (as opposed to American) spelling is occasionally used in quoted sections, which has not been updated to American spelling.

2

**PARTIES**

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Wise securities during the Class Period and was economically damaged thereby.

7.     Defendant Wise's principal executive offices are located at 1st Floor, Worship Square, 65 Clifton Street, London EC2A 4JE, United Kingdom. The Company is incorporated in Jersey, a small island, and British crown dependency. Wise US Inc, a company subsidiary, is located at 30 W 26th Street, New York, NY 10010.

8.     Wise describes its business as follows:

Wise is a global technology company, building the best way to move and manage the world's money. With Wise Account and Wise Business, people and businesses can hold 40+ currencies, move money between countries and spend money abroad. Large companies and banks use Wise technology too, an entirely new network for the world's money. Launched in 2011, Wise is one of the world's fastest growing, profitable tech companies. In the financial year 2026, Wise supported nearly 19 million people and businesses, processing over $243 billion in cross-border transactions and saving customers more than $3.3 billion.

9.     The Company's Class A ordinary shares trade on The Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "WSE."

10.     On May 11, 2026, Wise's ordinary shares were transferred to NASDAQ from the London Stock Exchange.

11.     Defendant  Kristo Käärmann served as Wise's Chief Executive Officer ("CEO") and as an executive director at all relevant times.

12.     Defendant Emmanuel Thomassin served as Chief Financial Officer ("CFO") and as an Executive Director at all relevant times.

13.     Defendants Käärmann and Thomassin are collectively referred to herein as the "Individual Defendants."

3

14.    Each of the Individual Defendants:

    (a)    directly participated in the management of the Company;

    (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)    was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (g)    approved or ratified these statements in violation of the federal securities laws.

15.    Wise is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.    Wise and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Class Period

18.     On May 11, 2026, Wise issued a press release entitled "Wise debuts US listing on Nasdaq." This press release outlined how Wise views an increased presence in the U.S. as crucial to its future business prospects. As detailed below, in the weeks since Wise's debut on the NASDAQ, it has been beset with regulatory setbacks.

19.     Defendant Käärmann was quoted as saying the following in the press release:

"Fifteen years ago, we set out with a simple but ambitious goal: to make moving and managing money around the world as fast, simple and cost-effective as sending an email. We've come a long way since then. In the last financial year, we helped nearly 19 million people and businesses, including banks like Morgan Stanley and Standard Chartered, move over $243 billion across borders instantly and at a fraction of the cost of traditional providers, saving our customers more than $3.3 billion in fees."

"Still, with $43 trillion moved across borders each year globally, we're only getting started. People and businesses around the world are estimated to be losing over $250 billion in hidden fees each year - including here in the US where that figure is expected to hit $43 billion in 2026."

"*We believe our US listing will help us accelerate our mission, helping to bring more of Wise to everyone in the US, as customers and as owners*."

20.     David Wells, the Chairman of Wise's board, was quoted in the press release as stating the following:

"*A listing in the US not only gives us better access to the world's deepest and most liquid capital market, it also more closely aligns Wise with the major growth potential for us in the US — the biggest market opportunity for our products in the world today*. We already serve millions of American consumers and businesses through Wise Account, Wise Business and Wise Platform, but we know that there are tens of millions more who need an alternative to the high fees, slow transfers, and unclear foreign exchange costs traditional providers offer."
"With this move we look to continue expanding our local presence and reaching thousands of US banks, online platforms and the many people and businesses who transact across borders."

21.     On May 11, 2026, the same day as the transfer of Wise's primary listing to the

5

NASDAQ, and before the market opened, Wise filed with the SEC a registration statement on Form S-8. This registration incorporated by reference the "Registration Statement on Form 20-F (as declared effective by the Commission on May 8, 2026), including the description of the Registrant's Class A ordinary shares contained therein, including any amendment or report filed for the purposes of updating, changing or otherwise modifying such description." (the "Registration Statement").

22.     The Registration Statement contained the following risk disclosure:

***Our business is subject to extensive regulation and oversight in a variety of areas, all of which are subject to change and uncertain interpretation.*** **(Emphasis in original).**

Our business is subject to complex and changing laws, rules, regulations, policies and legal interpretations in the markets in which we offer our products and services, including, but not limited to, those governing: payment services (including payment processing and settlement services), banking, deposit taking, cross-border and domestic money transmission, prepaid access, foreign currency exchange, privacy, data protection, data governance, cybersecurity, taxation, banking secrecy, digital currencies and payments, fraud detection, consumer protection, antitrust and competition, economic and trade sanctions, ***anti-money laundering and counter-terrorist financing.***

Regulators and legislators globally have been establishing, evolving, and increasing their regulatory authority, oversight and enforcement over financial services in a manner that impacts our business. As we introduce new products and services and expand into new markets, we expect to become subject to additional regulations, restrictions and licensing requirements. As we expand and localize our activities, we expect that our obligations in the markets in which we operate will continue to increase. In addition, because we provide products and services to customers worldwide, one or more jurisdictions may claim that we or our customers are required to comply with their laws, which may impose different, more specific or conflicting obligations on us, as well as broader liability. In delivering our strategy, we regularly evaluate our portfolio of licenses and regulatory approvals held in different jurisdictions in which we operate, including in major jurisdictions such as the United States and the United Kingdom, as well as other jurisdictions to which we may expand our operations. As part of that portfolio review, we may, from time to time, evaluate whether applying for additional licenses or approvals, or operationalizing or retaining those licenses, may be beneficial for the business. These additional licenses and approvals may subject us to additional rules and regulations, including capital requirements, and regulatory oversight. See "Item 4. Information on the Company—B. Business Overview—Government Regulation" for additional information on certain applications in process or under evaluation.

6

***Any failure or perceived failure to comply with applicable laws, regulations or orders of any government authority (including changes to or expansion of their interpretation), in particular in relation to anti-money laundering, economic and trade sanctions, fraud detection and taxation, has in the past and may in the future result in regulatory and legal consequences***. These may include significant fines, penalties, monetary damages, public censure, injunctive relief, criminal and civil lawsuits, forfeiture of significant assets and enforcement actions in one or more jurisdictions; result in additional compliance and licensing requirements; cause us to lose existing licenses or prevent or delay us from obtaining additional licenses that may be required for our business; increase regulatory scrutiny of our business; divert management's time and attention from our business; restrict or prohibit our operations; lead to increased friction for customers; force us to make changes to our business practices, products or operations; require us to engage in remediation activities; or delay planned transactions, product launches or improvements. Any of the foregoing could, individually or in the aggregate, harm our reputation, damage our brands and business and adversely affect our operating results and financial condition. The complexity of regulatory and enforcement regimes in the jurisdictions in which we operate, coupled with the global scope of our operations and the evolving global regulatory environment, could result in a single event prompting a material number of overlapping investigations and legal and regulatory proceedings by multiple government authorities in different jurisdictions. While we have implemented policies, procedures and controls designed to help ensure compliance with applicable laws and regulations, there can be no assurance that our employees, contractors and agents will not inadvertently or otherwise violate such laws and regulations.

If there is a conflict between the regulations to which we are bound (including conflict between regulatory requirements and applicable tax laws) and our operations, we may need to restructure our intercompany and third-party transactions to be in compliance with applicable regulations and any such restructurings could have adverse tax implications. Furthermore, it may not be possible to be in compliance with applicable laws and regulations to which we are subject if such laws and regulations pose conflicting and incompatible requirements on our business. Noncompliance with applicable regulations could harm our business, require the payment of significant fees or fines, subject our operations to additional tax liabilities, or prevent us from operating in the markets in which we currently or may in the future operate. Furthermore, any tax, fee or other requirement or restriction exclusively on money movement or money management services could put us at a competitive disadvantage to other means of payment or money management which are not subject to the same taxes, fees, requirements or restrictions. Such initiatives may increase our or our customers' costs and have a material adverse impact on our business, financial condition and operating results. Finally, our business could be harmed if a government in a jurisdiction in which we operate were to levy taxes on money movement.

Further, governmental agencies worldwide have imposed, and may impose new or additional rules on financial services affecting us; our third-party providers, including our payment processing and banking partners; or commercial counterparties, including regulations that:

- prohibit, restrict and/or impose taxes or fees on payment transactions in, to or from certain countries or with certain governments, individuals and entities;
- impose new requirements, change requirements or re-interpret existing requirements regarding the acquisition of local currency for disbursement to recipients;
- impose additional customer identification or due diligence requirements, including requirements to verify the professional, immigration or other status of customers;
- impose additional third-party provider due diligence and vendor management requirements;
- impose additional disclosures, reporting or recordkeeping requirements, or additional enhanced transaction monitoring;
- limit the types of entities capable of providing cross-border payment services, impose additional licensing or registration requirements on us, or our third-party providers, or impose additional requirements on us with regard to selection or oversight of our third-party providers;
- impose or increase minimum capital or other financial requirements on us or our third-party providers;
- limit or restrict the revenue which may be generated from money movement, including transaction fees and revenue derived from foreign exchange or investment services;
- require we provide additional, jurisdiction-specific consumer protection rights to our customers across multiple jurisdictions;
- require the principal amount of money originated in a country to be held or invested in that country or held in a trust until the relevant governmental agencies are paid;
- limit the number or principal amount of payments that may be sent to or from a jurisdiction, or the amount of certain currencies that may be held within a jurisdiction, whether by an individual, through one third-party provider, or in aggregate;
- impose more stringent information technology, cybersecurity, privacy and operational security requirements on us or our third-party providers and their service providers, including relating to data transfers and the use of cloud infrastructure; and
- impose additional risk management and related governance and oversight requirements, including relating to the outsourcing of services to other group companies or to third parties.

In addition, changes in regulatory expectations, interpretations or practices could increase the risk of regulatory enforcement actions, fines and penalties. If the regulatory bodies that oversee our operations adopt, or if customer advocacy groups are able to generate widespread support for, positions that are detrimental to our business, then our business, financial condition, operating results and prospects could be harmed.

*On June 16, 2025, we applied to the Office of the Comptroller of the Currency (the "OCC") for a national bank charter to establish Wise National Trust ("WNT") in the United States. If our trust application is not granted, our ability to scale our U.S.*

8

*operations     efficiently may be impacted*. We may also continue to face operational and cost    inefficiencies due to dependence on third-party banks and a competitive disadvantage   against those with national trust bank charters or similar bank authorizations who could     offer faster and cheaper settlement of transfers involving U.S. dollars.

If our trust application is granted, operating a national trust bank would introduce a higher level of scrutiny and operational complexity than our current U.S. money transmitter licenses ("MTLs"). We would be subject to a higher degree of federal oversight and compliance failure could result in severe enforcement actions. In acting as a fiduciary for customer funds, WNT will also be responsible for the investment and management of those assets. If the investments perform poorly or are mismanaged, WNT could be exposed to liability. Any of these factors may adversely affect our business, operating results and prospects.

23.     The risk disclosure in ¶ 22 was materially false and misleading at the time it was made because it materially understated the regulatory risk facing the Company, given that it was under active investigation by Belgian authorities. Further, the risk disclosure materially understated the chance that Wise would not receive a national bank chart from the Office of the Comptroller of the Currency (the "OCC") in the United States as a result of "longstanding," material, and pervasive concerns with Wise's anti-money laundering ("AML") protocols, and inadequate efforts to prevent terrorist financing, which were either known to Defendants or should have been known to Defendants. Additionally, by placing the language regarding the OCC towards the bottom of the risk disclosure, Defendants further sought to hide the material risk regarding Wise not receiving a national bank charter from the OCC to the reasonable investor.

24.     The Registration Statement included the following risk disclosure, which stated in part the following:

> *If we, or the financial institutions that we work with, fail to comply with the regulatory license conditions in a given market, our operations would be adversely affected.* **(Emphasis in original)**

> The provision of money movement, payment, stored value/e-money and other financial services is highly regulated, and the requirements vary from jurisdiction to jurisdiction. We obtain and maintain licenses issued by governmental authorities that, in some cases, including in the United States, permit us to operate without holding a bank charter.

Obtaining and maintaining a banking license or bank charter, including in the United States, would subject us to additional and different regulatory requirements that may be above and beyond what is required by our current licensing portfolio. These may include capital and liquidity standards, as well as additional reporting and disclosure obligations.

***Nevertheless, as an entity licensed to provide these services, we are subject to extensive financial, operational and other regulatory requirements that we must comply with to maintain our licenses and conduct business***. These may include: net worth requirements; restrictions or obligations with respect to customer funds, including requirements to maintain insurance or reserves in an amount equivalent to outstanding payment obligations and limitations on our investment of customer funds; bonding requirements; liquidity requirements; limitations on the amount and type of receivables we may be owed by our affiliates or third parties; requirements for regulatory approval of controlling shareholders; reporting requirements; ***anti-money laundering and countering the finance of terrorism compliance requirements;*** privacy and cybersecurity requirements; customer disclosure requirements; and monitoring, examination and oversight by regulatory agencies in the jurisdictions in which we operate.

As part of our licenses or authorizations, we are required to comply with a significant number of requirements. ***We cannot guarantee that our controls, policies and procedures will fully prevent failures to comply with specific requirements***. We also provide services into and from jurisdictions in which we are not expressly required to be licensed or authorized, in reliance on exemptions or our understanding of the applicable authorization regime.

\*        \*        \*

***If we, or the financial institutions that we work with, are unable to conduct our business in compliance with the licenses, laws, regulations and standards to which we are subject, or if we are not able to remain compliant as they change, or if changes negatively impact our businesses, we may decide to or could be forced to leave certain markets, stop offering certain products or services to our customers or be subject to increased costs or fines***.

25.    The statement in ¶ 24 was materially false and misleading when it was made because it couched failures to comply with AML and counter terror-financing laws in hypothetical terms while discussing *future* hypothetical failures when, in reality, Wise had a *present* and material "longstanding" deficiency in AML and anti-terror financing processes and controls. As such, the statement materially understated the risk to Wise in terms of regulatory compliance and in terms of its future prospects.

26. The statements contained in ¶¶ 22 and 24 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) in order to have a successful debut on the NASDAQ, Defendants materially understated Wise's regulatory risks as a result of its materially deficient anti-money laundering efforts, as well as insufficient efforts to prevent the financing of terrorism; and (2) as a result, Defendants' statements about Wise's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

27. On June 1, 2026, before the market opened, Reuters published an article entitled "Fintech Wise's shares fall on Belgian money-laundering investigation."

28. The article stated that Wise "London-listed shares fell by more than 10% on Monday on news that the Brussels Public Prosecutor's Office is investigating its European entity in cases the prosecutor said reportedly involve more than half a billion euros ($582.5 million) in suspicious transactions."

29. The article stated that "[t]he prosecutor's office *said the investigation, which began last year and is nearing completion, concerns potential money laundering offences*, *with alleged links to fraud, corruption and drug trafficking*." The article further stated that "[p]rosecutors are investigating whether Wise Europe's services were used by international criminal organisations, and are currently finalising a direct summons before the criminal court."

30. On the same day, before market open, Wise filed with the SEC a current report on Form 6-K, which stated, in pertinent part, the following:

Combating financial crime is an industry-wide challenge that Wise takes extremely seriously as a financial institution with over 80 regulatory licences globally, enabling us to serve more than 19 million active customers worldwide and process around 4.7 million transactions per day.

*We are currently working with the Brussels prosecutor to respond to queries about our business, as we routinely do with regulators and law-enforcement authorities*. His office's enquiries are still incomplete and no specific findings have been shared with us to date. As such, it would be speculative for us to comment on any allegations. We will continue to engage with the Brussels prosecutor's office if and when any specific findings are made available to us.

Wise Europe is established in Belgium, from where we serve the rest of Europe through the EU passporting system for financial services. Consequently, law enforcement requests throughout the EEA are currently directed to Belgium, a different set-up to those financial institutions that operate a branch or local entity network and where law enforcement requests would therefore remain with the respective authorities in each country.

All financial institutions are expected to respond to requests for information from law enforcement agencies and submit suspicious activity reports to the relevant authorities — these are a normal part of operations and are not, in themselves, indicative of non-compliance with anti-money laundering requirements or of any wrongdoing.

Like every financial institution, we face the reality of increasingly sophisticated bad actors attempting to exploit our platform, and we continually invest in tech-enabled systems and teams to stay ahead of ever-evolving threats. We start by verifying customers before they open an account and continue monitoring hundreds of data points in real time as customers use our products, with teams reviewing transactions, offboarding customers when needed, and proactively reporting suspicious activity to law enforcement.

31.    On this news, Wise's U.S. listed shares fell $0.67 per share, or 5.24%, to close at $12.10 on June 1, 2026. The following day, they fell a further $0.56 per share, or 4.6%, to close at $11.54 per share on June 2, 2026. The next day, they fell a further $0.82 per share, or 7.1%, to close at $10.72 per share on June 3, 2026.

32.    Then, on July 24, 2026, *The Wall Street Journal* published an article entitled "Wise Group Shares Drop After U.S. Regulator Denies License on Shortcomings."

33.    The article stated, in part, the following:

London-listed shares in fintech company Wise Group fell *after U.S. regulators denied its application for a national trust bank license, citing deficiencies in its program to combat money laundering and terrorism financing*.

\*        \*        \*

Wise, which earlier this year moved its primary listing to the Nasdaq, said it invested significantly in enhancing its processes and controls in the U.S. and globally since it prepared the original application, including those to prevent financial crime alongside other forms of risk.

\*        \*        \*

*The Office of the Comptroller of the Currency said in its rejection letter that Wise's application presented significant supervisory and compliance concerns*. *It cited long-standing deficiencies in anti-money laundering and countering the financing of terrorism at Wise U.S.*

The company said in response that it has been addressing historical issues with its original application mentioned in the OCC letter. Wise said it strengthened its local U.S. program and enhanced investigation and reporting processes among other changes made since its original application was filed.

While the group prepares to submit a new application, its operations remain unaffected by the regulator's decision, it said. Wise said that it continues to operate normally under existing money transmitter licenses across 48 U.S. states and four territories.

The  OCC decision comes months after Wise moved its primary stock market listing to New York, while retaining a secondary listing on the London Stock Exchange. *When it announced its intention to pursue a U.S. listing, the company said it saw in the country the biggest market opportunity in the world for its products*.

34.    On this news, Wise U.S.-listed shares fell \$0.75 per share, or 6.2%, to close at \$11.33 per share on July 24, 2026.

35.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

36.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Wise securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

14

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

15

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

43. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

49.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential

17

proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

50.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

51.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

52.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

53.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

54.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

55.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices

57.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

58.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

59.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 31, 2026                    **THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

20